Good morning everyone. The first case on the call, on the docket this morning, is case numbers 1, 2, 3, 5, 9, 4 and 5, 9, 9, Roberts v. Board of Trustees Community College District No. 508, Agenda No. 12. Mr. Thomas, if you're ready, you may proceed. And gentlemen, I understand you're both going to argue your respective positions for 20 minutes and then you're going to split the rebuttal or reply time five minutes each, is that correct? That's correct, and I'll argue the rebuttal first. Okay, thank you. Good morning. Good morning. Mr. Chief Justice, and may it please the Court, my name is James Thomas and I represent the Board of Trustees of Community College District No. 508, commonly known as the City Colleges of Chicago. Disregarding this Court's on-point holding in Turner v. Memorial Medical Center and four decades of retaliatory discharge jurisprudence, the First District here set forth a new standard for the tort of retaliatory discharge in Illinois. A specific, clearly mandated public policy is the foundation and has to date been the historical limitation on the tort of retaliatory discharge in Illinois. The appellate court here, nonetheless, set forth a supposed public policy in the broadest terms, finding that because the government decided to back student loans, it must think that higher education is important, or a quote-unquote good idea in the words of the appellate court, and that a clearly mandated public policy therefore exists as to the right to higher education. Thus, according to the appellate court, because a public policy exists in the right to a higher education, any complaint by an employee in the higher education field that implicates something potentially detrimental to higher education is protected under principles of retaliatory discharge. This formulation of retaliatory discharge cannot stand. This Court's decision in Turner v. Memorial Medical Center, a case strikingly similar on both factual and legal grounds, requires that the appellate court be reversed. In Turner, this Court set forth the quotation at page 507 that might well sum up this case, just on a different subject matter. This Court said, we agree with the appellate court's special concurrence that the provision of good medical care is in the public interest. It does not follow, however, that all health care employees should be immune from the general at-will employment rules simply because they claim to be reporting on issues that they feel are detrimental to health care. The appellate court here did exactly what this Court said not to do in Turner. It decided that higher education was something in the public good, and it immunized every employee in the higher education field who complains about something potentially detrimental to the higher education product. In Palmateer, this Court instructed that public policy is to be found in this state's constitution, in the statutes of this state, and where those are silent, perhaps in judicial decisions. Mr. Roberts does not contend, and the appellate court did not find, that there is any clearly mandated public policy in this state requiring specific qualifications for the instructors of the HEAP Pro 101 course about which Mr. Roberts supposedly complained, a survey course at the city colleges, an introduction to the health careers available at the city colleges and their programs. No Illinois or federal law, rule, or regulation sets forth any specific qualification for instructors of HEAP Pro 101 or any components of that course. No Illinois judicial decision sets forth any specific requirement for instructors of HEAP Pro 101 or any of the components of that course. The General Assembly certainly could have done so, and has done so in other educational areas. In this state, you must be a certified teacher to teach in an elementary school or teach in a high school, and you must have certain content knowledge. That our legislature did not make such a determination here should tell this Court all it needs to know about the existence of a clearly mandated public policy implicated by Mr. Roberts' determination. This Court can and should stop there. In fact, the appellate court should have stopped there, because there is no clearly mandated public policy. But the appellate court went further. Because there is nothing in federal or Illinois law requiring any specific qualifications for instructors of this court, the appellate court said at paragraph 32 of its decision, I quote, It is axiomatic that in order to accomplish the mission of educating young men and women, defendant must staff its classes with competent individuals who actually possess the knowledge listed in the course syllabus. If it's axiomatic that a higher education institution must have qualified instructors, so too must it have the appropriate syllabus, and the right books, and the appropriate physical facilities. Because after all, all of those things are potentially detrimental to the ultimate educational product. In essence now, any complaint by an employee in the higher education field that they feel is detrimental to the ultimate educational product is protected by retaliatory discharge. This type of logic is exactly what this Court rejected in Turner with respect to patient safety. It simply does not suffice to establish a specific, clearly mandated public policy under the law of this state. It is not enough to say that there is some general overriding good. This Court has instructed multiple times that a plaintiff must point to a specific, clearly mandated public policy that's set forth, as I said, by the appellate court. This Court has instructed multiple times that a plaintiff must point to a specific, clearly mandated public policy that's set forth, as I said, by the appellate court. One of the elements of that contract is that a higher education institution must comply with the standards of its accreditors. So there is something in the statute that references accreditors. However, there is nothing in the Title IV of the Higher Education Act that requires any specific accreditor to be used, requires any specific qualifications for instructors. And when we talk about the accreditors here, or the accreditors alleged in the complaint, the plaintiff sets forth three accreditation or certification bodies with some general requirements they claim were not met in this case. But this Court has never held that anything other than the statutes, the Constitution, and the judicial decisions of this state, where the federal government may form a clearly mandated public policy, has never allowed private accreditation standards to suffice. But if we look at this case, there's actually three other failings in what Mr. Roberts tries to do. First of all, if we look at his complaint, he never alleges that any of the three accreditation bodies that he claims set forth the appropriate standards have anything to do with the City College. What his complaint says is, there are these three bodies, and they generally require you to have qualified instructors. But there is no allegation that these are our accreditation or certification bodies. In fact, they're not. And even more so than that, Title IV of the Higher Education Act in the Department of Education, the Federal Department of Education, publishes a list of approved creditors for Title IV purposes. Those are available on its website. The accreditation and certification bodies cited by the plaintiff are listed nowhere on the Department of Education's website. Second, much like the case in Turner, there is no specific recitation or citation to a specific accreditation standard that would be violated in this case. The plaintiff generally says that the accrediting bodies require there be a qualified instructor and that they be competent, but there's no specific citation to what we have allegedly violated. And third, and I think this is a more general point, is that using accreditation standards presents a host of problems for this court. And this case is a perfect example of that. Because there can be multiple accreditation bodies. And so if there are multiple accreditation bodies, which one forms the clearly mandated public policy of this state? If accreditation body A says you must meet these requirements, and accreditation body B says you must meet these requirements, which one is the law of this state? Because the statute requires no specific accreditation body to be used. Your Honors, I think if we go back to this issue of what Mr. Roberts actually says is the public policy implicated here, which is the right to higher education, that public policy is directly contrary to what this court said in Turner needed to be stated. This court was clear in Turner that generalized statements of public policy have the potential to end the at-will doctrine here in this state. Moreover, this court cautioned that the requirement for a clearly mandated specific public policy is important because an employer is entitled to notice. Notice that their actions in terminating an employee would violate this court, this state's clearly mandated public policy. And if we look at Kelsey, that was clear. There's a statutory regime for workers' compensation. Employers should know if I fire an employee for exercising their statutory right, I have potentially violated the law of this state. This court said in Turner, generalized expressions of public policy fail to provide essential notice to employers, and that the phrase clearly mandated public policy will be recognizable simply because it is clear. There is nothing clear about Mr. Roberts' supposed public policy or its application to his complaints. At-will employment has been the law of this state for well over a century and remains the law today. In Kelsey and Palmateer, this court created a narrow, limited exception to that doctrine. And then came in 1984 by Barr v. Kelso Burnett, and a plaintiff asked this court to find that retaliatory discharge was not limited and narrow at all. In fact, that this court's decisions in Kelsey and Palmateer expressed a general and broad tort. This court said no. It said retaliatory discharge is a limited and narrow cause of action. And in every case since Barr, this court has been clear about the exceedingly narrow boundaries of the tort and has cautioned against erosion of the at-will doctrine through expansion of the tort. As I've talked about, Mr. Roberts seeks to divine his right to higher education through Title IV of the Federal Higher Education Act. The Illinois Appellate Court also introduced into this case, we believe improperly, the Illinois Higher Education Loan Act. Both of these statutes deal with funding of higher education student loans. They have nothing to do with running a college. They have nothing to do with the day-to-day operations of a college. They don't set forth any specific requirements for a college. The mere fact that our government has decided to back student loans does not create an absolute right to a higher education and then that somehow immunizes employees if they are potentially talking about something that could be detrimental to higher education. Because this type of logic can be applied across the myriad of rules, regulations that are in our Illinois compiled statutes and the United States Code. For example, there is the National Endowment for Arts, a federally, statutorily created organization. The introductory language to that statute, which is 20 U.S.C. 951, contains the same type of oratory language that the Appellate Court seized on in the Illinois Higher Education Loan Act to find that there is a right to higher education in the state of Illinois. So will an Illinois court next find that there is a right to art in this state through public funding? And if so, does that mean that disagreements about the qualifications of an artist become fodder for retaliatory discharge in this state? That can't be so under this court's holdings. Now taking it a step further, as I've already mentioned, Mr. Roberts tries to turn private accreditation standards into the law of this state. As I mentioned, this court and no court in Illinois has ever found that private accreditation standards can suffice as the public policy of this state. All of the concerns that I raise here today about the retaliatory discharge tort can be cured by one thing, and it is what this court has said all along is the heart of the tort, a specific, clearly mandated public policy. This court should therefore reverse the Appellate Court's decision with respect to Mr. Roberts' retaliatory discharge claim. The mere fact that higher education and student loans might be in the public interest does not mean that every complaint by an employee in the higher education field protects them from the at-will doctrine and termination. Now if there's no further questions on that, I'd like to move on to the second issue in this case, which is Section 20 of the Illinois Whistleblower Act. With respect to Section 20 of the Illinois Whistleblower Act, this court is presented with a straightforward question. What does it mean to refuse? There is a straightforward answer to that question. A refusal is the denial of something offered or demanded. Where there is no offer or demand, there can be no refusal. The necessary predicate for the word refusal is that there is an offer, demand, and opportunity to participate in something. Mr. Roberts readily admits that not only was he never asked by the City Colleges to participate in the activity he claims to be unlawful, he consistently and specifically alleges that the City Colleges excluded him from that process. Mr. Roberts has pleaded himself out of court with respect to Section 20. Section 20 provides that an employer may not retaliate against an employee for refusing to participate in the violation of a state or federal law, rule, or regulation. The starting point, as this court has noted many times for interpretation of a statute, is the plain and ordinary meaning of the language. Again, we think that's the stopping point here as well. There is a plain and ordinary meaning of the word refusal. In the leading case to date on Section 20, the First District's decision in Sardega v. Northern Trust, they look to Black's Law Dictionary for the definition of the word refusal, which defines refusal as the denial of something offered or demanded. That definition, the requirement for an offer or demand, has been accepted by every federal and state court in Illinois that has looked at the meaning of Section 20. The First, Second, and Fourth Districts have accepted that. The Seventh Circuit, in a case that predates Sardega, accepted that same sort of formulation, and courts in the Northern and Southern Districts of Illinois have accepted that interpretation. No Illinois court has ever accepted the proposition set forth by Mr. Roberts that a complaint, a naked complaint, without any request that someone participate in an unlawful activity qualifies under Section 20 for protection. I think an example with respect to the word refusal that's present here in this courtroom today is illuminating. I cannot refuse to be a justice of the Illinois Supreme Court today deciding this case. No one has offered me the opportunity to be a justice. No one has demanded that I be a justice. No one has given me any chance to participate here today as a justice of this court. I could affirmatively say, if offered, I would not participate as a justice. But within the plain and ordinary meaning of the English language, I simply can't refuse because I've never had the opportunity to participate in the first place. The definition that we set forth of the word refusal is also consistent with the remainder of the Illinois Whistleblower Act. One of the canons of statutory interpretation in this state is that you have to read the whole statute, and you can't read words or phrases, terms out of it. The other core substantive provision in the Illinois Whistleblower Act is Section 15. Section 15 makes complaints about unlawful activity by an employer in certain circumstances, and those are certain narrow circumstances. When an employee makes a complaint to a law enforcement or governmental agency, if, as Mr. Roberts suggests, merely complaining is sufficient to qualify as a refusal under Section 20, Section 15 would be meaningless. Every complaint would be a refusal, and there would be no meaning to the legislature's clear determination that only certain complaints should be protected under the Illinois Whistleblower Act. Would it undermine the policy of the Whistleblower Act to reject protection for that kind of reporting of an allegedly unlawful act to the employer when it's reported to a governmental agency or law enforcement? I don't believe it would, Your Honor, because I believe that the legislature has made a determination in this case that two types of really core allegations will be protected under the Whistleblower Act. Complaints about unlawful activity made to a governmental or law enforcement agency and refusals to participate in unlawful activity. The legislature certainly could have set forth a broader definition. In fact, in our briefing, we list a number of other states that have Whistleblower Acts that specifically protect objection to or refusal to participate in an unlawful activity. Our legislature has made a determination, and we would note, as we did in our briefing, that an internal complaint to an employer without a refusal is still protected so long as someone can set forth a sufficient public policy under our common law retaliatory discharge doctrine. So this is not the case where, by reading the statute in this way, we would somehow leave somebody without any potential. The legislature has made a determination as to what will be protected under the Whistleblower Act, and there simply is no reason for this court to expand that definition. If it needs to be expanded, that's a legislative determination to be made by our General Assembly. We therefore would ask this court to affirm the appellate court's decision with respect to Mr. Roberts' claim under Section 20 of the Illinois Whistleblower Act. Refusal has a plain and ordinary meaning. Someone must be offered or demanded and deny that offer or demand. Mr. Roberts has alleged the exact opposite here and therefore has not set forth an actionable claim. Thank you. Thank you, Mr. Thomas. Mr. Paul Holman. Good morning. My name is Brian Holman. I'm here today on behalf of the plaintiff, Henry Roberts. The very purpose of the Illinois Whistleblower Act is in jeopardy to the appellate court's opinion standards. The purpose of the Illinois Whistleblower Act states that an employee who calls attention to the illegal ways or activities of his employer has protection under two situations. Under Section 15, when it protects employees who contact a governmental agency to report the improper activities of his employer. Section 15 is not an issue in this case. Under Section 20, an employee is protected if he refuses to participate in an illegal activity. That individual is a whistleblower. A whistleblower is someone who brings to the attention of the employer the improper or illegal acts they're engaging in. Mr. Holman, how exactly did the plaintiff refuse to participate? I get that he was not in the loop and that he complained a lot, but how did he refuse anything? The plaintiff, like I said, was the actual whistleblower in this situation. He was the individual who was responsible for vetting professors and making sure they were qualified to teach the courses in which they were assigned. The plaintiff discovered that there were many complaints about the professor, and when he did found out, he sat down and talked to the professor and found out that the individual was not qualified. In fact, the professor admitted to not being qualified to teach. Once the plaintiff found out that the qualifications were not there for the professor to continue to teach the students, he complained. He complained to all of his supervisors, to the president, to the vice president, and to his direct supervisor. Are you asking us to write the word refuse out of the act? I'm not. Refuse means to indicate or show you're not willing to do something, especially something offered or requested, right? And that's exactly what he did. He demonstrated that he was not going to participate in the activities that were involved. He could have remained quiet. He could have went along with the plan and allowed the professor to continue to teach without doing anything, but he didn't do. He refused to participate. What could he have done other than object and continue to complain and refuse to stand silent while this was going on? What else could he do to refuse to participate? Short of leaving his employment, how does an employee refuse to participate? The statute is quiet on that. What does it mean to refuse to participate? The Northern District of Illinois, a recent case in October of 2018, the Montoya case, had an interesting quote. It said to refuse to participate, the plaintiff must have had the opportunity to participate and rejected that opportunity. Once Mr. Roberts complained, he brought to the attention of his employer that there's an illegal activity going on. The employer could have said, Mr. Roberts, you're right. This activity isn't proper and could have stopped right there. Had the employer stopped the illegal activity, Mr. Roberts would not have had the opportunity. Was there ever a request made for plaintiff to participate in the assignment of the unqualified professor? No. And the palace always continues to say that we've planned ourselves out well. The assignment of the professor is the first step in the illegal activity. Once you assign someone, until that teacher actually steps in the classroom and begins to teach, it's not the assignment that's illegal. It's the trying to teach the students without the qualifications. It's an ongoing improper conduct. He was excluded from naming the teacher. Right. So he didn't support the decision to appoint an unqualified professor, but I still get back to this word refuse to participate. He was out of the loop. That's one of the things he complained about. How did he refuse to participate if he was out of the loop when it was all in process? He was kept out of the loop on the assignment. Once the assignment was made, it's when the professor was beginning the illegal activity. The illegal activity is not so much the assignment as is the uneducated or the uncredentialed professor teaching the students. That's where the defrauding of students comes in. It's when the teaching begins. That's when he was continuing to refuse to participate through his complaints and his failure to sit up and be quiet throughout the process. The appellate court in paragraph 38 ironically used this very word. He refused to cover things up, be quiet, and look the other way. The appellate court uses the word refuse. No one requested me, an overt request or demand of Mr. Roberts, to not cover things up, look the other way, be quiet. Yet the appellate court said he refused to do those things. He had the opportunity to remain quiet. He refused to do so. How would he do that? Through his objections, his continued objections, continued throughout the semester. He refused to participate, allowing that professor to continue to teach the class. That's how refuse works. If we have to have an overt request or a demand from the employer to the employee to engage in illegal activity, there is no whistleblower in that scenario. The Whistleblower Act is not even in play at that point because the employer is identifying their illegal activity. The employer is saying, we're engaging in this illegal activity. He had no right to fire the teacher, right? That's correct. Let's look at the definitions. Refuse means under Webster, which basically is the same as Blacks, it's to indicate or show you're not willing to do something, especially something offered or requested. Now, would you agree there was nothing offered or requested to the plaintiff? There was no overt express. I agree with that. But once he makes his complaint, there are forms of retaliation. What is he not willing to do? He had no right to hire or fire. Now, what is he not willing to do? As the director of medical programs sits and allows an unqualified professor to teach the course. And that manifested itself in complaints. Complaints and objections. But what other form of refusal is there? What is the employee required in the state of Illinois to demonstrate? The legislature used the word refused. It must mean something, right? I agree. But how much more refusal is there? How does one demonstrate a refusal? They either continue to object. He could have left his employment. What other way could he have refused to participate? The public court actually found that he refused to cover things up. That is what the protection was put in place for. He was the whistleblower. He was the individual who brought to the attention of the employer during a legal activity. At that point, he had the opportunity to participate, go along with it, or refuse to participate. He had that opportunity. He took what he thought was right, what was his responsibility as a program director. And he continued to object and then refused to stand quiet while this was going on. Did they ask him to stand quiet? Was there an overt request for him to remain? Yes. No. But while he continued after his initial objections and throughout this, they kept him out of the meetings, they refused to allow him to do his that job activities, that retaliation began immediately. There are acts of retaliation. You didn't allege that they asked him to cover things up or to be quiet or to not complain. You didn't make those allegations and complain. I did not, no. I thought we – you have to look at the fact that this is the very individual who is responsible for making sure that this professor was qualified. That's – he's the individual identified illegally. He is delicible. If there is a requirement that there's an overt request to engage in illegal activity, then the employer is gaining protection under Section 20 of the Elisiblo Act. If the Robert Cepelic decision is affirmed. If the conduct is illegal, an employee can report it to the appropriate government agency, right? And then he's protected under Section 15 of the Act. That's true. That didn't happen here. To which governmental agency should Mr. Roberts contact it in this situation? There is no – does he go to the Chicago Police Department and say, you know, something's going on here? What governmental agency was available to Mr. Roberts in this situation? It's not a clear-cut agency where, oh, they're doing something illegal. I should go to this governmental agency. So what – that brings up another question. What state or federal law was being violated by the college? The Title IV of the Higher Education Act of 1965 was cited in the plaintiff's complaint. And how so? Section – Is it on the student's right to an education? Is that what you're saying? That is the stated purpose of the Act. That Act requires, in order for students to be entitled to seek federal and state funds, the institution, the city colleges, has to be an approved organization, institution. In order to do so, the city colleges are required to enter into the Program Participation Agreement. Program Participation Agreement has many requirements for the colleges to make sure that they maintain the proper qualification for federal programming and state financial programs that the students get in the agency. The violations that occur as a result of their activities is that they didn't comply with the requirements of the Program Participation Agreement in violation of Section 20 U.S.C. 1094. The Program Participation Agreement requires that the professors meet the accreditation requirements of the appropriate associations. Counsel continually raises the point that this is an accreditation issue. It goes beyond accreditation. The Program Participation Agreement and the Act requires that they give accurate information to the accreditation programs regarding their programs. They have to certify that these professors are qualified to teach the courses that they're assigned to. They gave inaccurate information because the professor was not qualified, and the professor admitted to not being qualified, and that's a flood in the plans complaint. Admitted to the program director that she was not qualified,  In fact, the professor, after her conversation, she abandoned the class. She left. They brought in another professor who was equally unqualified. The Title IV of the Health Employment Act requires that you not misrepresent the nature of your education. These students are not getting the education which they pay for. They're being taught by a professor who doesn't know how to teach the course in which they're typical. In medical programs, these students are going out to obtain certifications, and they're not meeting the minimum requirements because of the fact that they're not being taught by a qualified professor. They're not qualified to get the job in which they're seeking after they can finish these classes. And as the appellate court found, they're defrauding the students. Could you just help with that fact? You're saying they can't get a job in their field because of the lack of qualification of the teacher? Yes. How does that work? The teacher has to teach the curriculum in order for these students to get certified. At the city college, a lot of the education they're seeking... If the student goes through the course, and perhaps the teacher is not a good teacher, but passes the course, does that affect the certification? In the class we're talking about, this is a phlemonic class. They want to become phlemonics. They want to be able to draw a book. The teacher that's teaching the class is not certified herself yet. She did not know the qualifications in order to make sure they're meeting those qualifications so they can obtain that certification once they graduate from the class. So they pass the class, and now they go to be certified. How are they affected by the fact that the person was a nurse and not certified in blood drawing? They didn't meet the curriculum. They didn't meet the curriculum? So they'd be denied a license because of the quality of the certification of the teacher? They could not, one, pass the certification because they weren't taught that appropriately. But if the representative... I don't understand what you mean. They would flunk the test for certification? Or there would be some denial of their certification because of the quality of the teacher? I think it could be both. Because if the school is certifying that this student passed this class, has gone through and learned the certification requirements, and then they go on and have not learned the appropriate methods because the professor was unqualified to teach them, then they could fail in, one, obtaining the certification through the fact that they weren't qualified, or once they get into the practice, if they are able to pass the certification test, they haven't learned the skills necessary in order to properly do it. That's the risk. How could someone learn to properly draw blood when the professor who's teaching the class isn't certified in that area as well? But as the appellate court found, these students were defrauded by the state government. They went and obtained loans or used their private funds to pay for a class to be taught by a certified... and a professor who knows what they're doing, who knows how to teach a curriculum. And they did not receive what they paid for. When doing a statutory interpretation, the court can look at the purpose of the act. The Illinois Whistleblower Act is to protect whistleblowers. If there's a requirement that there's an overt request or demand from the employer that the employee engage in the illegal activity, there is no whistleblower in that scenario. The employer is already aware of their illegal activity. How can Section 20 of the Whistleblower Act protect someone who is not technically a whistleblower? The Whistleblower Act presupposes that the individual is a whistleblower. If the employer overtly requests and demands that that individual engage in activity, there is no whistleblower in that situation. Section 20, Section 15 doesn't apply. The employee has to be a whistleblower in order to gain protection under the Whistleblower Act. The question under this issue, though, is one of statutory interpretation, subject to de novo review. Is that correct? Correct. And so the first step in our analysis is whether the statutory provision is plain on its face. Is that right? I agree. And we're not to read into it anything if it's plain, right? I agree. Okay. Thank you. If there's no more questions regarding the Whistleblower Act, I'd like to go on to the second issue regarding the retaliatory discharge action. Now, the right to obtain the benefits of post-secondary education through federal and state-funded programs is the public policy that is issued here. That's not something that the plan has developed and put into place. That specific public policy is identified in the federal statute in which the plan is identified. Title IV of the Higher Education Act of 1965 says the very purpose of that act is to provide loan programs to assist in making available the benefits of post-secondary education to students. The Illinois Health Court also relied on the Illinois Higher Education Loan Act, which states, in essence, the same purpose. The benefits to the people of the state of Illinois. It's not an individual situation. It's to the entire society. Our society benefits by the fact when individuals go and increase their knowledge and get a post-secondary education. That helps the entire community. If we state there's a public policy right to obtain the benefits of a post-secondary education under the program, how does the discharge violate policy provisions in your second amendment complaint when it does not speak to the qualifications or quality of instructors in those institutions? Mr. Roberts was very individually responsible for making sure that these individuals, professors, were qualified. The purpose of these acts is to provide the benefits of post-secondary education to the students through the availability of public funds. The city colleges, our students, almost entirely have some type of public funding available. That was jeopardized. The very possibility of obtaining an education at city colleges was jeopardized by the maintenance of improper and unqualified professors. The individual who was responsible for maintaining and making sure of those was the individual who said, we have to address these unqualified professors. His termination goes directly to the purpose of those acts. Directly to the purpose of the public policy in place. The benefits of secondary education through public funding. If the employer is able to terminate the very individual responsible for maintaining the accreditation of the university and make sure the qualifications of the students and professors are there, that directly impacts the public policy that was taken. Thank you. Mr. Thomas, five minutes for your vote. Your Honors, distilled to its essence, what Mr. Roberts really is asking this court to do on Section 20 is to find that the act is supposed to apply to whistleblowers, and so this court should rewrite it to protect him because he is a whistleblower. That's not how statutory interpretation works. The Illinois Whistleblower Act protects two very clear things. Complaints made to a governmental or law enforcement agency, which as this court heard, Mr. Roberts says, is not an issue in this case. And refusal to participate in an unlawful activity. There simply was no refusal here, and Mr. Roberts cannot qualify under the Illinois Whistleblower Act. Moreover, this notion that there can never be a claim under Section 20 because no employer would ever ask their employees to violate the law simply is not true. And this court can look to its own jurisprudence to find that because in Wheeler v. Caterpillar, which is a retaliatory discharge case out of this court in 1985, the allegation was that I, the employee, have been demanded by my employer to drive a forklift with nuclear material on it that is detrimental to my health. And this court found that that was protected under principles of retaliatory discharge. That's exactly what Section 20 is intended to protect as well. An employer asks somebody to do something. What they're asking them to do is in violation of a law, rule, or regulation, and the employee says, no, I'm not going to do it. That didn't happen here. And I think, Justice Thomas, your point is spot on because Mr. Roberts says to this court, well, to whom was I supposed to complain? Well, if there's no one for him to complain to, how is this illegal? We don't have laws that can't be enforced. Mr. Roberts, if he thought that this was improper, could have gone to the Department of Education. He could have found someone to go to. He didn't. There was no refusal. And I think one point really needs to be cleared up from what counsel for Mr. Roberts said. There is no requirement in the state of Illinois for a phlebotomist to be certified. There is no requirement in the state of Illinois by statute that there are any specific credentials for a phlebotomist in this state. In fact, with merely a high school diploma and some training by your employer, you can be a phlebotomist. But what Mr. Roberts asked this court to find is that if you're not taught by a certified phlebotomist, then there's some danger here to the public, and then we get again to this sort of derivative idea, maybe that is patient safety, maybe that is the right to higher education. So under Mr. Roberts' theory, we could have the greatest doctor in the state of Illinois teach these students how to draw blood, but it's not right because they're not a certified phlebotomist. That can't be correct, Your Honor. And finally, what I would offer to this court is that there is no violation of Title IV of the higher education. What Mr. Roberts tries to do here is set in place a series of dominoes that must fall over. He starts at this end of the dominoes and says, broadly, there is a right to higher education. He starts at that end of the dominoes and says, well, if we don't have qualified instructors, then that domino topples and the students won't get what they're paying for, and then the next domino topples because you may lose your accreditation, and if you lose your accreditation, well, then you can't get any student loan funding. That series of dominoes is exactly what this court said in Turner is not appropriate for a specific, clearly mandated public policy. You have to, as a plaintiff, point to something in the law that is specifically and clearly mandated. The plaintiff has not done so in this case, and so we would ask this court, as I have previously said, to reverse with respect to common law retaliatory discharge and affirm with respect to Section 20 of the whistleblower act. Thank you. Thank you. Mr. Holman, five minutes. Thank you. If the appellant court's opinion is allowed to stand, it will be required in the state of Illinois that an employee plead and ultimately prove that an employer made an overt request or demand that they engage in a work activity. How often does that occur? How often, especially after the appellant court's decision, would an employer be so brazen to reach out to an employee and say, you engage in legal activity? That doesn't occur. But yet that is the requirement under the appellant court. You have to be able to plead that someone came to you and requested that you engage in legal activity. Plead the proverbial smoking gun. As plaintiff counsel, I would love to have that opportunity case after case. It doesn't exist. The statute is quiet as to what refusal to participate means. What does an employee do to demonstrate refusing to participate? He can either engage in the activity and hope he doesn't get retaliated against, go along with it, or, as the appellant court found in paragraph 38, you can refuse to remain quiet. He refused to remain quiet. When he blew the whistle, the employer had the opportunity to correct the improper activity. He did have the opportunity to decide whether or not he was going to engage in any legal activity or allow it to continue. He did everything he could. What else could an individual do? He made the objection. He refused to remain quiet. And he would not participate in that activity. But requiring him to be able to plead that someone ultimately came to him and said, engage in any legal activity, those situations don't arise. And employers now will go forward and say, management, never request, never make a demand that an employee engage in illegal activity because that's now the law of the state of Illinois. So long as we don't request or demand, then we can allow illegal activity to go on. In fact, when a whistleblower advises us that we're engaged in illegal activity, terminate that individual. But don't make a request or demand that they participate. Because that's what the law says. As long as we don't make that overt request or demand, we're fine. We have the protection of Section 20 of the Whistleblower Act. Protection is now provided to the employer and not to the employee. There is no whistleblower in the scenario where the employer comes to the individual and says, engage in illegal activity. There is no whistleblower in activity. The Whistleblower Act does not even come into play. There has to be. It presupposes that there is a whistleblower involved in order to gain protection under the Illinois Whistleblower Act. The appellate court's decision is going to go away with it unless this court reverses that decision. As for the common law, the tele-court discharge, there are federal statutes and state statutes that specifically identify the public policy that was issued. That was frustrated by the termination of a very individual who is responsible to make sure that the students are taught by professors who are qualified. If you allow an employer to terminate someone responsible for making sure that they're in compliance, that frustrates the very public policy that's identified in the statutes that are cited. Thank you very much. Thank you, Mr. Holman. Cases numbered 1, 2, 3, 5, 9, 4, and 5, 9, 9 will be taken, Roberts versus Board of Trustees, will be taken under advisement as agenda number 12. Thank you, Mr. Thomas, Mr. Holman, for your arguments this morning. You are excused. Thank you.